May it please the Court, I'm Jeff Clark from the Justice Department. With me at counsel table is Mark Hague. I'd like to reserve five minutes for rebuttal if I could. Your Honors, one of the most oft-repeated words in the red brief by Exxon here is that the Chemical Safety Board, the CSB, is engaged in a roving inquiry. They're trying to look into issues beyond catalyst dust. They're engaged in the equivalent of an inquisition is the implication from the briefs. And I'd like to suggest to you that that's very far afield from what we actually have in front of us. No, the CSB didn't have to row very far here to issue the subpoenas to look into the issues that it wanted to look at. The alkylation unit containing thousands of gallons of modified hydrofluoric acid was within the blast radius. When the explosion at the refinery in Torrance occurred, a 40-ton chunk of debris was hurled from the electrostatic precipitator over 100 feet and fell within five feet of the alkylation unit where this acid, this very dangerous acid sat. Can I ask you a question right there? Yes, Your Honor. Had there not been this flying piece of, very large piece of debris that came so close to the tank, would you have been seeking information about that unit nonetheless? We perhaps might have, Your Honor, because of the fact that it was adjacent. That's pretty iffy. Well, I mean, so we don't deal with hypotheticals, right? The Chemical Safety Board is looking at the actual facts as they were presented. And as they were presented, it was the 40-ton chunk hurled 100 feet to within five feet of the tanks. But whenever you're talking about designing a refinery or any kind of manufacturing plant, Your Honor, you have to look at what you're putting next to any given unit. And so if you're going to look at the safety of that unit, you want to look at the relative location of other things that could be affected if there was an accident at that unit. And one more question. You, of course, have a specific request among the five requests that are on appeal here that deals with siting decisions. That's correct, Your Honor. So if that one may be relatively easy to justify, although Exxon may have some words about that, but how does that extend to all of the others, particularly ones that seem to overlap with and duplicate the information sought there? Well, Your Honor, I think that whenever one, you know, does the equivalent of even a discovery request in civil litigation, right, each of the individual requests is not necessarily hermetically sealed from the other requests, right? It's entirely possible for them to have, you know, overlaps. And I think that's true here. So I think each of them is independently justifiable, right? The first one is about risk assessments at the alkylation unit, right? So if you have thousands of pounds, thousands of gallons, I should say, of modified hydrofluoric acid sitting around, that's a very dangerous substance. It eats through glass. It can cause skin burns, eye burns. It can even cause heart attack and death. So that's the reason to ask for information about that when it's exactly adjacent to the cracking unit, which is what exploded in 2015. The second request is from information and manufacturers of the modified hydrofluoric acid for the nature of that substance, particularly because it has been modified and it's not a well-studied substance, Your Honors. And so what information do those vendors have? They have information about the way in which the process, way in which that product was formulated, right? What is contained in it? What do the chemical safety sheets show about how safe it is? The third category was what's the possibility and what's the scientific information on whether hydrofluoric acid could volatilize and vaporize? And that's very concerning because we're not just talking about an Exxon facility that's located in the middle of nowhere. We're talking about an Exxon facility that's located in a residential neighborhood. Later in September, there was actually, of that same year, there was a release of just five pounds of this stuff, and it caused a persistent cloud to hang around for five hours. So imagine what would have happened if a 40-ton piece of debris from the electrostatic unit had smashed into the tanks and spilled them. What kind of cloud and what persistence of then? So that's the relevance of the third item. The fourth item is a request for what the volume and concentration of the modified hydrofluoric acid was. That's clearly something you would want to know, right? If it happened to be that those tanks were very full on that day and, you know, there were less impurities in it than there were on other days, it's clearly something that the chemical safety board, if they're going to prepare a report, is entitled to know. And the last category is the one I was discussing with Judge Rosenthal about the sighting distinctions. And we think that it's clear that that's relevant information as well. So you briefed this appeal mostly as if the district court had interpreted the applicable law correctly but then applied it incorrectly. And I'm wondering if actually maybe there is a legal mistake here in somehow reimporting some sort of notion of causation into the case. It's a little bit hard for me to understand what the district court was thinking other than somehow that this acid was not part of the cause of the explosion. Yes, Your Honor. I think that, you know, Exxon made the argument that, you know, two things. Number one, since the 40-pound chunk didn't hit the acid tanks, it wasn't part of the accident. So call that kind of like a factual divorce. No harm, no foul. No harm, no foul. But I don't think that's the way safety agencies work. They're entitled to look at the potential consequences of what happens if there's an accident. And then the second argument was that it was just a fishing expedition or something roving, as I started with, to look into, you know, larger safety studies as to the nature of modified hydrofluoric acid. You know, it's possible that the judge, you know, bought into that. But I don't think that, you know, the judge remotely sort of exercised the proper light touch that this statute requires, especially in deference to the experts at the CSP. I mean, the standard review here is, you know, in your regard, abuse of discretion. But what the district judge is supposed to be doing, according to the EEOC v. FedExpress case, is quite narrow, a strictly limited inquiry. All you need is some plausible ground for jurisdiction. You're supposed to avoid interference with proper functioning of the agency. The relevant standard is not especially constraining. You know, you get access to virtually any information that might cast light. Is there no limit, then? I mean, this was presented as a subpoena to, in order to analyze the risk assessment for the, how do you pronounce it, alkylation unit. If they had asked for the risk assessment of the, if the entire refinery blew up, would there be some limit there? Your Honor, I definitely think that there would be limits. That's why I tried to start with the fact that the facts here are very strong for us. We're only looking at risks that went to the adjacent unit in the same refinery. You know, maybe if we asked for information from a refinery that Exxon had across the country, you know, or if it was just undisputed as a matter of fact that there was some kind of, you know, firewall break that would prevent consequences in one subunit from affecting another subunit. But that's not what we're dealing with here. You know, 100 feet propelled could easily have been 105 feet propelled, and then you suddenly have thousands of gallons of acid that are potentially released right next to a residential neighborhood. Can I ask one other question on that, though? Sure. And it's related to everything we've been talking about. So there are different parts to subsection C. Yes. And those are the subsections that are enforceable, that are — that the Department has or the Board has subpoena authority to get information and documents about. Under which subsection were you proceeding? So, Your Honor, I think that I can prevail in this case under subsection 1, because I think where this — You're talking about C — C1, right. So R6C Romanet 1. I think I can prevail under C1, because where this landed as a result of, we think, a foreseeable accident, you know, is something that was part of the facts, circumstances, and conditions of this accident. So I think that's sufficient. But let me go on to make to you, you know, an argument that we did make below, and I think, you know, that Judge Marshall didn't seem to think that we made below, which is And Exxon even concedes that under sub L of the statute, that's where the subpoena power is. Sub L of the statute refers to C unadorned. It doesn't refer to — No, I understand. That's why I asked. Okay. Exactly. So, you know, I think you can easily get into C1 and C2. Well, that's my question. Okay. Under C2, we haven't seen any periodic report to Congress or any other agency that would use the information you garnered to recommend measures to reduce the likelihood or consequences of accidental releases. There's no indication that I could see in the record — and that's where I'd like your help to point me to where in the record I might find it — any indication that you were proceeding under anything but C1. So, Your Honor, I think in terms of C2, there's not a requirement to actually issue a report, right? It's part of the what informs seeking the information, right? And we're not dealing with a relevant standard. This is another error the judge made below. You can see it — No, I understand that. — in the transcript that she was looking at a relevant standard in terms of admissibility of evidence in court. But that's not the relevant standard we're dealing with. We're dealing with relevance to an investigation. And so as long as the investigation could lead to such a report, you know, we think that it's entirely within the span of the CSB's power to ask for it. But that's always possible. So, I mean, does that mean that every time you are looking into the facts and conditions and circumstances, you are also using your ability to pursue recommendations to make the whole process better? I think, yes, Your Honor. At least we need to keep that option open. So, you know, the way that — Any record support to indicate that that's what you were doing here? I think on that, Your Honor, I would stand on the — well, actually, no. Let me refer you to the petition, right? So the petition at paragraphs 10 and 11, right, they cite both C1 and C2. And it's not just a brief reference, right? C2 is quoted basically in its entirety. So I think I'd stand on it as a matter of law and on the fact that we put it in the petition. If I'm reading my timing right, it looks like I have 340 left. If so,  Thank you. Thank you. Good morning, Your Honors, and may it please the Court. The question here presented today is whether Judge Marshall abused her discretion when she determined that five subpoena requests by the CSB were not relevant to this investigation. ExxonMobil responded to 329 document requests and challenged 56. Judge Marshall allowed the parties to have full briefings on this. She held a hearing. There was a 25-page record transcript of that hearing. I think very tellingly the government did not cite that record transcript at all and didn't present it to Your Honors. We had to actually include that in the record. I think that's very telling. Because at that hearing, she went through doing what a district court judge does. She went through and applied this law, this statute, to these facts, to these specific subpoena requests. And she heard argument from both sides. And she looked at the actual subpoenas and what the government cited on those subpoenas. And she made determinations that 29 of those were enforceable. And she actually looked at and split. Part of it was enforceable as it related to the FCC, the ESP. And part was non-enforceable as it related to other units in the plant. So she looked at that and split it. And then 26 she found enforceable. We would have had a different analysis. We would have applied the law to these facts differently. We certainly don't agree with her that the 29 should be enforceable. But we recognize that these are difficult line-drawing exercises. And they are exactly the type of exercises that a district court, particularly one like Judge Marshall, is best suited to draw. Well, I think that depends whether we view this as a question of law or a question of fact, doesn't it? Well, I submit, Your Honor, that this is a question of law being applied to the facts. So it inherently has both. But if the real issue here is what does circumstances mean, why would the district court be better at figuring out what circumstances in this statute means than we are? Well, I think she understood what circumstances mean. She takes that word. It's a pretty common word in the English language. And it applies it to these subpoena requests. I'm not sure you can divorce the two. Well, the problem I have is that she didn't look at it as a circumstance of the explosion of the unit that exploded. The request was for risk assessments performed for another unit. And if you look at it as a question of whether it's for another unit might be one thing. But if you look at it as whether this is a circumstance of the unit that exploded, it's a different question. And as I see it, what is presented to us is a question of whether or not this can be investigated as a circumstance of the unit that exploded. And it just seems to me that the question was presented to her a little differently than it is presented  But the statute is different. Well, I was there and I submit differently. But I'm happy to talk about the law. I'm happy to talk about the law. And I think that, you know, there's a Why isn't this a circumstance? Why isn't the proximity of this unit to the unit that exploded a circumstance of the explosion? Yeah. Well, let's talk about that. And let's also talk about in the context of these specific requests. So first, the law. I think Congress is quite clear in prescribing the limits on CSB's investigatory power. The government concedes that CSB does not have plenary authority here. It must be limited in some way. And I would submit that C1 is exactly how that is limited. The facts, conditions, and circumstances of the accidental release. The government keeps saying, and said it repeatedly in their oral argument just now, the accident. They stay away from release. That's a key language in C1. Why? Because they like to talk in hypotheticals. But why isn't it a circumstance of the release that if it had hit five feet away, there would have been a further explosion? Well, I think it's a circumstance that the debris, where the debris goes. And Exxon, that's why I want, let's talk about the actual requests here. We are not opposing, and we did not oppose, information about what was released, whether it be in the air or on the ground. And in this case, there was this piece of debris that the government's focusing on that landed on the scaffolding of the alkylation unit. So we produced Why isn't the question what that piece of debris might have hit a question about the circumstances of this release? Well, I think it could be. But that's a line-drawing exercise. And you can play that hypothetical out further and further and further. But the point I want to raise, because this was I think a mistake, perhaps accidental, but we have produced information pursuant to the government subpoenas that show the sighting. But you haven't, I don't recall that the major issue here was that it was duplicative or overly wordensome. No, I'm not making that argument, Your Honor. And what I'm saying is that they've gotten information about what C-1 would suggest, which is information about the sighting hazard of the ESP unit. And this is actually, I think, answer to one of your questions. The ESP unit is actually an environmental unit, ironically, that was installed decades after the alkylation unit. And so the sighting of that unit and the documents and studies that went into that, all of which have been produced, is what's relevant to determining the risks of that debris or, for that matter, the debris could have gone 200 feet the other way and hit a parking lot or something. You know, I mean, these are hypothetical situations. Are you saying that that sighting information discusses what would happen if the debris hit this acid container? It talks about the sighting in relation to everything around it, which would include the alkylation unit. So it doesn't talk about a release of hydrochloric acid because there's no dispute here on this record that there wasn't a release. And I submit that this Congress wants the CSB to focus on actual releases. This is an agency that has about a $20 million budget. They can't be running around spending all their time thinking about hypothetical releases. I think Congress is well within its discretion and power to limit CSB's investigatory authority where it can be most useful, which is actual releases. So they're not supposed to look at close calls. See, that's as a member of the public, it bothers me a little to say you can only look at what actually happened when you have writing and what actually exploded when you have the investigatory authority covering the facts, conditions, and circumstances of the explosion. So the close calls, like almost two airplanes crashing into each other, but they didn't, should be within the investigatory authority of any agency investigating it. It seemed to me that this is similar. What I would say, Your Honor, is it should be within their overall authority and it is. Subsection F is the specific section that focuses on near-miss and hypotheticals. It has that language, potential release. But what about C2? C2 is about the reports that get written from C1 investigations, reports to Congress. I'm not sure there ever has been one, but there are reports that they write. They got that authority and Congress gave it to them? No, I agree. And C2 is about those reports that are based on C1 investigations. But there's no mention of... But it's broader. It's broader than C1 in the sense that it allows investigation into the processes or procedures that might improve the safety, which might... It could be read that way. First of all, it was waived twice. It was waived, it was not cited on the subpoenas, so we had no basis to challenge it on C2. It was not mentioned in the papers. It was something Judge Marshall specifically addressed at the hearing. The government then waived it again in its opening brief and it was only after our brief that they felt, whoops, we actually need this C2 authority. We're going to go back and grab onto it as a further basis to justify our C1 investigation power. So I think a lot of their brief is a de novo review, not at all the abuse of discretion standard that this court is required to apply after McLean. But abuse of discretion always contains a component about identifying the correct legal test and we review that part de novo even within abuse of discretion, don't we? I agree. I agree. And I think that Judge Marshall's application of that law to these facts... First of all, her interpretation of that law and application to these facts was not only correct and reasonable and certainly well within, certainly not clearly erroneous, certainly not beyond the pale, certainly not illogical or implausible. But I think we still have to make sure that she identified the correct legal standard and I'm not sure I understand your definition of circumstance if somehow it doesn't include causation. Can you explain to me how you have a definition of circumstance that doesn't include causation? That's a good question. So I would say it's the circumstances of the release. So that's a pretty broad term and we produce documents that show how broad it is. For instance, we produced risk analysis related to the ESP unit and the FCC unit. Those go far beyond the cause or probable cause of the release. It's all the circumstances that relate to that particular unit. So that's one example and it's in the record. So you're saying the effects are included in circumstances. Is that basically what you just said? I say the... No, I was talking of the potential effects. Yes, I guess the potential effects are in that sense with respect to the FCC unit. So within that FCC unit... So you have to limit it to the unit in which the release occurred and you can't extend even to the right next door unit that, but for five feet, might itself have been pierced and a release occurred there as well. Well, first of all, we don't know that. That's this hypothetical and the government used the... So the five feet's not? No, the five feet is not. But they use the word imagine quite a bit and claim they don't deal with hypotheticals, but that's their entire argument. So I would say that, again, I think the fact of where the debris lands is relevant. That's part of the overall circumstance of the release, whether it's in the air or on the ground. An extensive material was provided, not just to this agency, but 17 other agencies that responded. So this is unnecessary? No, I'm not saying that. I'm not saying that. I think we think that CSB plays a very important role and, in fact, we work very closely with CSB to produce their 73-page report. I was a very good job at analyzing safety issues as it relates to releases and accidental releases and it was a very cooperative relationship between the company and CSB. We immediately provided them with 80,000 pages of records within three weeks of their arrival and they came three weeks late. Every other agency arrived on the day of. CSB comes three weeks late, but that didn't matter. We gave them a full briefing, gave them experts to talk to. We weren't required to do that, but we felt it would be helpful to them. So the amount of cooperation here is extensive. You said something earlier about their limited budget, but they're here fighting this case using some of that budget. So why shouldn't we understand that to mean they think this is really important? Well, what I was getting at is whether Congress thought it was important, not whether the CSB thought it was important. I think the CSB, certain members of the CSB, mentioned on day one of their arrival, actually before they even came, that they were interested in studying MHF. They didn't talk about interest in studying the FCC or the ESP. They talked about their interest in studying MHF. So I think that's fine. They can certainly do that. And by the way, there have been other releases of MHF which they, for whatever reason, chose not to study. But even here, they can do that as a general hazard study, but a general hazard study doesn't come with subpoena power. Congress was very specific about what gets subpoena power and what can allow a government agency inside the fence. Which takes us back to the C-2 question. In what? Because subpoena authority would extend to that. Well, subpoena authority, I think the C-1 lays out the investigation piece. So I think of that as the subpoena authority. You're right that Al talks about C generally, and I think that's because C-2 reports flow from C-1 investigations. So how do we reconcile the language of C, F, and L? Well, I think that's a great question. I think if C-1 does what they think it does, or C-2 for that matter, F would be entirely superfluous. And it's a basic concept of statutory interpretation that we can't read out sections of the statute. If C-1 and C-2 allow them to engage in hypothetical risk assessments, I mean, investigations, then what's the purpose of F? There was an accident here. Sorry? There was an accidental release in this case. There was, and we didn't F is a broader provision that says you don't need it. You don't even need an accidental release if you want to do research. But what we're talking about is an investigation of an actual release. That's correct. Well, I think it's a great question. It's very telling. Counsel spent a fair amount of time talking about his confidence in C-1. I think it's very telling that their brief is almost entirely filled with references to other pieces of the statute. We're not saying that that's irrelevant to CSP's mission, but we are saying it's not helpful in this context in terms of analyzing whether or not Judge Marshall committed a clear error, which we think she did not, whether or not she abused her discretion, which we think she did not. These are difficult line-drawing exercises, and we can come up with hypotheticals all day long. Those things could have gone 200 feet the other direction. That's just a random event. It could have exploded in a different part of the ESP, which would send the debris into a parking lot, and then they'd come in here and ask to study, perhaps, potentially, under this interpretation, Fords or Ford trucks or Chevy trucks, which ones are safer, and how much gasoline can you have in the engine or asphalt or concrete paving. So, I mean, where do you draw that line? And I think, in closing, and I think I'm over, but in closing, I would just say that we're not suggesting this isn't a difficult line-drawing exercise. What we are suggesting is that that exercise is well within Judge Marshall's discretion. Thank you very much. Thank you. So Your Honors, we're dealing with, I have a lot of different client agencies at the Justice Department. I'm dealing with a prophylactic agency here. We haven't sued Exxon. We're investigating. And at the moment, there's just a giant gaping hole in our report. We did the best we can, based on the information that we did get. But there's a gaping hole in the report, based on looking at this modified hydrofluoric acid substance, and what could have happened if it was just an extra five feet. So we completely agree with Judge Schroeder that – I just have a factual question that maybe I misunderstood from the briefs. Is it actually an extra five feet, or just five feet to the side? Like, was it within the radius? So it was propelled 100 feet, is my understanding, and that was five feet away. It being a piece of debris. Right. The piece of debris, the 40-ton chunk, was propelled 100 feet and got to within 500 feet of these acid tanks. Within five feet? Within – yeah, within five feet, yes. But was it the acid tank 105 feet from the location of the explosion, or was it 100 – within 100 feet, just over to the side? Yes, yes. I believe the answer to that is yes, Your Honor. Yes. Okay. So, I mean, is there some – so this is actually slightly outside the radius. I mean, is there some boundary where you're too far outside the radius? Well, I don't think it's outside the radius. I think if it could be propelled 100 feet, based on a particular explosion, it could have been propelled 105 feet. And part of what we're looking at in terms of the siting analysis, right, is how close is a safe distance from it? And this looks like a pretty – you know, usually you have margins of safety, right? You know, factors of 10. But what if the acid was 300 feet? If the acid were 300 feet, but it were still the adjacent unit, I think we would probably still be here, but we're not dealing with facts that are 300 feet, so – That would be your judgment as to what you would want to investigate. Right. And that's – what we really see with Judge Marshall's decision, I think, is no indication that she's giving deference to, you know, an expert agency. I mean, these are the folks who study chemical safety, right? Also, you know, as my esteemed colleague here was arguing from in terms of the budget of the agency and so on, this is an important case. That's why I'm here. That's why this case has spanned multiple administrations. It's not something that's been dropped. We want to get this information, and we think it's entirely relevant under the statute, and we're entitled to get it. May I ask one other question about the extent of your argument? Some of the requests are limited to at the time of the release, and that makes eminent sense to me. A couple of the requests are unfettered by time or seek 15 years of information. Yes. And that troubled me because facts and circumstances and conditions are all at the time, and even the investigative authority that might be broader under C-2, if you're relying on that as well, seems to me to be stretched by getting historical information that goes way back. Well, certainly, Your Honor, most of what we're focused on is not historical, but Judge Marshall asked the same question you asked. I think it's a good, great question, fair question. And what the AUSA, Mr. Coyle, who was arguing the case, said, I'll repeat back to you because I agree with it, which is basically if you're in a refinery context, a lot of the equipment that's built was built quite a while ago, and it's not like it's undergoing constant inspections that the government has access to. A lot of the inspections that were taken back at the time that piece of equipment was installed. So that's the reason why there was some ranging backward in time. And again, I'd ask you for deference on that to the experts at the CSB. Thank you, both sides, for the helpful arguments. The case is submitted.
judges: Schroeder, Friedland, Rosenthal